**LOS ANGELES RAMS FOOTBALL CLUB, a partnership, composed of Frederick Levy, Jr., Edwin W. Pauley, Daniel F. Reeves and J. H. Seley, Plaintiff,**

v.

**Billy CANNON, Defendant.**

**No. 32-60 WB.**

United States District Court
S. D. California,
Central Division.
June 20, 1960.

John C. McHose and Gordon Wright (of Lillick, Geary, McHose, Roethke & Myers), Los Angeles, Cal., for plaintiff.

Lowell L. Dryden and Jacob Swartz (of Dryden, Harrington, Horgan & Swartz), Los Angeles, Cal., for defendant.

LINDBERG, District Judge.

Plaintiff, Los Angeles Rams Football Club, a member of the National Football League, and being a partnership composed of Frederick Levy, Jr., Edwin W. Pauley, Daniel F. Reeves and J. H. Seley, all of whom are citizens and residents of the State of California, has brought this action seeking injunctive relief and a declaration of right against the defendant, Billy Cannon, a citizen and resident of the State of Louisiana. The matter in controversy exceeds the value of $10,000, exclusive of interests and costs, and is within the diversity jurisdiction of this court.

Specifically, plaintiff prays for an injunction to restrain defendant from playing football or engaging in related activities for anyone other than plaintiff without the plaintiff's consent during the term of a contract or contracts allegedly entered into by the parties on November 30, 1959, and an order declaring the existence of a valid written contract or contracts.

Defendant denies he ever entered into a contract or contracts as alleged and further claims, as defenses to plaintiff's claims, fourteen affirmative defenses.

The first six, in substance, deny that the defendant ever entered a binding contract or contracts but that defendant merely made an offer which was not accepted prior to revocation. The others, in brief, consist of:

Fraud and deceit on the part of plaintiff, acting through Pete Rozelle, then the General Manager of the Rams;

The doctrine of unclean hands on the part of plaintiff barring the granting of equitable relief;

Lack of mutuality;

Breach of contract, if any, on the part of plaintiff;

That the contracts, if any, are unfair, inequitable and contrary to public policy;

That if the defendant entered into any contract he did so under a material mistake of fact; and

That the plaintiff has an adequate remedy at law.

The defendant, Billy Cannon, is a remarkable football player who has just finished his collegiate career with Louisiana State University. The last intercollegiate game he participated in was the Sugar Bowl game on January 1, 1960. Prior to that time, however, on November 28, 1959, or early in the morning of the 29th, he was contacted by telephone by Pete Rozelle, now Commissioner of the National Football League, but who was then and at all times material to the dispute here involved General Manager for the Los Angeles Rams. Mr. Rozelle was in Baltimore, Maryland and Billy Cannon was then in New York.

There is no question about the call being made but there is serious dispute as to the conversation had. However, we can safely assume that it had to do with football. (At this time I do not attempt to resolve the factual disputes but leave that for later consideration as I reach the issues.)

The telephone call mentioned occurred less than thirty-six hours before the annual selection meeting of the National Football League which was held in Philadelphia, Pennsylvania.

The Rams, after sifting an astonishing amount of information through a complex scouting system, concluded that Billy Cannon was the player of the current graduating crop they would most like to see on their team. The Rams, by virtue of ten losses and only two wins last season were tied for last place in the League, but as every cloud has its silver lining this fact also tied them for first draft choice at the above-mentioned selection meeting. The tie was to be broken by the flip of a coin. Thus it was that the Rams stood a fifty-fifty chance of having the first draft choice.

It has been the Rams' contention throughout that this position on the draft is so valuable that careful steps are undertaken to assure the team having the choice that it is not wasted on a player not willing to play for that team. The telephone call referred to was for the purpose of exploring that question.

On the 29th there was another telephone conversation between Mr. Rozelle and the defendant and on this occasion Mr. Rozelle was in Philadelphia. That night Billy Cannon took a train from New York to Philadelphia and registered at the Sheraton Hotel under the name of Billy Gunn at the suggestion and arrangement of Mr. Rozelle.

On the following day the selection meeting was held. The Rams won the toss of the coin and selected Billy Cannon as its first draft choice.

Immediately following the meeting defendant and Mr. Rozelle got together, met with members of the press, and discussed for the benefit of the press the fact that the Rams had received the first draft choice and had selected Billy Cannon.

Following the press interview Cannon and Rozelle went to Rozelle's hotel room where Cannon signed three sets of National Football Player Contract forms covering the years 1960, 1961 and 1962, and took possession of two checks, one for $10,000 and the other for $500.

Mr. Rozelle, on or about December 1st, left one set of said forms as filled out— that set embracing the 1960 season— with the then acting Commissioner, Mr. Gunsel.

Some two weeks later Billy Cannon was contacted on behalf of a Mr. K. S. Adams, Jr., who is the owner or part

owner of the Houston Oilers, a football club in the recently-formed American Football League. On or about December 22nd Cannon met with Mr. Adams and others in Baton Rouge and negotiations were had with respect to a so-called personal service contract including the playing of football.

On December 30, 1959 Billy Cannon sent to the Rams a letter wherein he announced that he no longer desired to play for the Rams, purportedly revoked any offer he may have made to play for the Rams, and returned therewith the two checks above mentioned uncashed and unendorsed.

Prior thereto, however, it is contended that Mr. Gunsel approved the contract for the 1960 season, and the exhibit as admitted, Exhibit A, bears the signature of Mr. Gunsel alongside of which the date December 1, 1959 was written in.

At this point I propose to treat the question of whether or not a contract or contracts ever came into existence, dealing first with the instruments themselves before getting into the difficult matter of what transpired prior to and at the time of signing. The question, then, is, What is the nature of the several documents signed by Billy Cannon November 30, 1959? Disregarding for the moment the interpretations of the parties, the court must look to the instruments themselves.

We have three sets of instruments, in triplicate, each denominated National Football League Standard Players Contract, admitted in evidence as plaintiff's Exhibits A, B, C and H; H being a photo copy of the League copy of the first set. The printed form is identical in each case with the exception that there are three riders attached to each copy of the first set. The first set has the year 1960 typed in the appropriate blank; the second, 1961; and the third, 1962.

Each form states that it is a contract between Los Angeles Rams Football Club, thereinafter called the Club, and Billy Cannon, thereafter called the play-er. It states that in consideration of the respective promises contained therein the parties agree to the following terms:

Paragraph 1 thereunder reads as follows:

"1. The term of this contract shall be from the date of execution hereof until the first day of May following the close of the football season commencing in ——— (blank for the insertion of a given year) subject, however, to rights of prior termination as specified herein."

Paragraph 2 obligates the player to play football for the club and the club, subject to the provisions of the contract, to hire the player as a skilled football player during the term of the contract.

Paragraph 3 contains the club's promise "to pay the player each football season during the term of this contract the sum of $——" payable according to a given schedule.

Paragraph 4 contains the player's promise to comply with the constitution, by-laws, rules and regulations of the League and of the Club, which are made a part of the contract; the right of termination for failure to so comply; the player's agreement to submit himself to the discipline of the League and Club; the handling of disputes by the Commissioner; and other details unimportant to this litigation.

Paragraph 5 is the negative covenant whereby the player promises not to play football or engage in related activities during the term of the contract for anyone else without the permission of the Club and Commissioner.

Paragraph 6 contains the player's warranty that he is and will continue to be sufficiently highly skilled in all types of football teamplay to play professional football of the caliber required by the Club and League and that he will perform to the complete satisfaction of the Club and its Head Coach. The provision then provides the right of termination should the player fail to achieve this satisfaction.

Paragraph 7 relates to the schedule of settlement in the event of such termination.

In Paragraph 8 the player represents that he has exceptional skill as a football player and that money damages would not compensate the loss thereof and he therefore agrees that the Club may enjoin him by appropriate injunction in the event of breach.

Paragraph 9 provides for sale or assignment of the contract.

Paragraph 10 provides for renewal for a further term subject to certain conditions.

Paragraph 11 contains the player's acknowledgement of the right and power of the Commissioner to execute certain disciplinary measures in relation to bribes, attempted bribes and game throwing.

Paragraph 12 provides for reimbursement to the Club of any Workmen's Compensation Benefits.

Paragraph 13 reads, in full:

"13. This agreement contains the entire agreement between the parties and there are no oral or written inducements, promises or agreements except as contained herein. This agreement shall become valid and binding upon each party hereto only when, as and if it shall be approved by the Commissioner."

Paragraph 14 provides that California law shall control. Paragraph 14 is the last paragraph of the form, following which there is space for the name of the Club, the signature of the Club's agent, the signature of the player, the signatures of two witnesses and space for the Commissioner's signature following the printed word "Approved." There are three date blanks, one next to the blank for the Club agent's signature, one next to the blank for the player's signature, and one next to the Commissioner's approval.

I have tried to cover as fully as necessary, but as briefly as that would permit, the form used by the Rams in their negotiations with Billy Cannon.

As heretofore indicated three sets of these forms were used. In the appropriate blank in Paragraph 1 the years 1960, 1961 and 1962, respectively, were inserted in the three sets. Each set contains the signature of Pete Rozelle for the Rams, Billy Cannon and the two witnesses. (I might state at this point, parenthetically, that no law this court is aware of requires this type of contract to be witnessed, nor does the contract itself set up such a requirement.)

Only one of the sets bears the signature of the Commissioner with respect to approval, and the evidence is to the effect that until late in December, 1959 the Commissioner was unaware of the other two sets.

The question germane at this point is just how important to these contracts is the Commissioner's approval. On this point, of course, the parties to the action are at opposite poles, plaintiff taking the position that it is an unimportant ministerial act concerning only the League and the Club, while the defendant takes the position that it is an act absolutely essential to the formation of a contract.

It is the opinion of this court that on this issue the defendant must prevail. Approval by the Commissioner is essential to the formation of a contract here and this is so because the terms of the document make it so.

Keeping in mind that these forms were furnished by the Rams and not Billy Cannon, the court calls particular attention to the words regarding approval:

"This agreement shall become valid and binding upon each party hereto only when, as and if it shall be approved by the Commissioner."

Paraphrasing: "Shall become valid * * only when * * * and if * * * it shall be approved * * *"

The words "shall become valid" clearly compels the conclusion that—in the absence of approval—it is not yet a valid agreement.

The use of the word "if" clearly suggests that approval might not happen at all.

This clause is too definite to be ignored. It jumps out at you. The words employed are too strong to permit of ambiguity. Their selection was obviously made with great care so that there would be no dispute about their meaning, and this court attaches to them the only meaning it can—that is, that the agreement shall only become valid and binding if, as and when approved by the Commissioner.

If there were not reason enough for so holding there are further reasons inherent in the instruments themselves which makes this conclusion inescapable.

We have earlier noted that paragraph 1 describes the term of the agreement "from the date of execution hereof until the first day of May following the close of the football season commencing in ————" (whatever year is placed in the blank provided). This paragraph defines the term and it clearly allows for more than one year. If such a contract were executed today and the year 1970 were placed in the blank it would be, to my way of thinking, a contract for a term in excess of ten years.

Paragraph 3 obligates the Club "to pay the player *each football season* during the term of this contract" a stated sum. This again is persuasive that this form permits a term in excess of one year unless there is more than one football season in one year.

Paragraph 1 tells us when a term ends but it does not tell us when it begins. If, as contended by plaintiff, the date of execution is the date it is signed by the Club and player, we would have in the case at bar three contracts, all commencing on November 30, 1959, one running to May of 1961, the second to May of 1962, and the third to May of 1963. And as each contract calls for payment for each season within the term Billy Cannon might have a contract calling for a grand total of $95,000, including the bonus.

This, of course, is so absurd that no one would suggest that that is what either side intended to do here.

This absurdity does not exist if it is determined that approval is essential to execution, as I find it is. When approval is essential to execution and that act fixes the beginning of the term, the Club, so long as it sits on the instrument, controls the beginning of the term thereunder and at the same time the number of seasons it shall cover. This, perhaps, may well be one of the reasons these instruments are not submitted for approval until just before the year typed in the blank.

Section 7 of Article XII of the Constitution and By-Laws of the National Football League, which, of course, is a part of the forms by reference, provides that the only instrument which will bind a player to any club is the form used here when executed and filed in the office of the Commissioner. It provides that the club first filing such a contract shall be awarded the player and that the time of filing shall be the time of filing it in the Commissioner's office. If two teams within the League signed the same player and the last team to sign the player were the first to file the contract with the Commissioner there can be no question under this provision who would be awarded the player.

For League purposes it may be very essential to provide this sort of arrangement in order to avoid disputes between teams within the League. But the only way this can be accomplished within the framework of law is to make the Commissioner's approval an essential part of execution, otherwise the Commissioner would be destroying the legal efficacy of binding contracts, a thing the courts would be powerless to do. This provision, which is within the four corners of the contract, is one more persuasive indication that approval is essential to execution.

Counsel for plaintiff in oral argument cited certain cases for the proposition that the signature of the Commissioner was no more than a condition precedent

to performance. I do not find these cases apposite.

In the case of Burns v. Peters, 5 Cal.2d 619, 55 P.2d 1182, 1183, the trust deed involved did provide, "This deed of trust shall not be effective unless prior to its recordation, the trust is accepted by the trustee * * *." There a stranger to the instrument was attacking its validity. The trust deed was not accepted by the trustee, but it was delivered by the grantor to the beneficiary and was treated by the parties as a valid trust deed as between themselves, and in California, as was pointed out in the opinion, a trust does not fail for want of a trustee. The beneficiary was entitled to come into court and have a trustee appointed in lieu of the named trustee, and this in fact was done. In the case at bar nothing was delivered to Cannon and it cannot be urged that Cannon, even if there had been delivery as between the parties, could have compelled some sort of approval in lieu of the Commissioner's.

Significantly, the court pointed out in Burns v. Peters, 5 Cal.2d at page 623, 55 P.2d at page 1184:

"While the respondent argues that the clause requiring an acceptance by the trustee is plain and calls for no construction, he overlooks the fact that that clause conflicts with other portions of the instrument and that the meaning of the entire instrument is involved."

In the case at bar it is only when the plain meaning of paragraph 13 is ignored that conflicts arise. Further on the court in Burns v. Peters states:

"The general rule is that where two clauses of a contract cannot be reconciled the first shall be received and the latter rejected."

But as shown, the clauses of this contract can be reconciled beautifully. It is only if we accept plaintiff's interpretation of the word "execution" as it occurs in paragraph 1 that there is any conflict. But the determination of what the word "execution" means there is the real issue of this action, and, as shown before, accept-ing plaintiff's meaning of the word creates a legal monstrosity when all three exhibits are viewed together.

Counsel for plaintiff also refers to the case of Watson Bros. Transportation Co. v. Jaffa, 8 Cir., 143 F.2d 340. There the lease with option of a trucking route required approval of the Interstate Commerce Commission. Court held that agreements may exist notwithstanding that required approval of a public agency has not been had. This is unquestionably true but that is not the case here. This court does not hold that contracts may not have validity and binding effect notwithstanding clauses requiring approval. What the court does hold is that here the court must attach to clause 13 the very meaning the draftsmen of these forms must have attached to it.

Olen Real Estate & Investment Co. v. L. A. Zieman & Co., an Alabama case reported in 269 Ala. 106, 110 So.2d 890, 892, is another case involving a contract containing a condition precedent to performance; that is, "the release and approval of Olen's contemplated mortgagee." The court there found that the release and approval was a matter resting entirely with said mortgagee, not a party to the contract, and that the provision was not a condition affecting the validity of the contract to convey. Here Paragraph 13 requires approval before the contract becomes valid or binding. Also in the case at bar the approval of the Commissioner was not a matter resting entirely with the Commissioner. They had to be first submitted by the Rams, and there is no showing nor am I able to find that the Rams were under any obligation to so submit them.

It is my conclusion, therefore, that until approved, these instruments are, at most, only offers.

In this respect these instruments are not like the numerous contracts we see containing conditions precedent to the creation of obligations thereunder. These instruments do contain the condition precedent of making the team before the obligation to pay the salary arises, but the requirement for approval in

these instruments is much more than a condition precedent to a mere obligation; it could be characterized a condition precedent to execution but it is more properly to be denominated a part of execution, so made by the people who drew up the form.

If we are to adhere to the doctrine of freedom of contract we must allow parties to specify any degree of formality to the act of execution they wish so long as it doesn't violate public policy or some rule of law.

We may conclude, therefore, that what we have been loosely referring to as the 1961 and 1962 contracts were, at most, only offers and are now unquestionably revoked. That leaves the question of whether the 1960 instrument became a contract.

Having concluded as a matter of law that the alleged contracts—Exhibits A, B and C—under the provisions contained therein when signed by the defendant on November 30, 1959, constituted no more than an offer by Cannon to play football for the Rams until accepted by them and approved by the Commissioner. I next consider what the terms of the offer were.

It has been plaintiff's contention that they made the offer to Cannon and that he accepted that offer. That, as I have already stated, was not the result as a matter of law under paragraph 13 of the alleged contracts. Further, it must be borne in mind that plaintiff was not in a position to make a firm offer to Cannon under the Constitution and By-laws of the League until after the "flip of the coin" which occurred on Monday, November 30, 1959, some two hours or thereabouts before Cannon signed the documents.

The terms of the offer cannot be ascertained from the several documents alone, presenting as they do, if the interpretation urged by plaintiff is followed, an ambiguity as to the term of service covered under paragraph one of the documents and the compensation to be paid under paragraph three, as I have earlier pointed out.

It becomes necessary, therefore, for the purpose of determining whether there was a manifestation of mutual assent, to consider the conversations and circumstances preceding and occurring at the time of the signing of the contract forms.

The testimony of Cannon and Rozelle as to many of the facts is directly contradictory and I shall attempt to resolve their disagreement only as to the more pertinent facts and statements such as appear essential in deciding what the understanding between them was. In so doing I have weighed the conflicting testimony with particular care, trying alternately to sustain the testimony of each within the framework of the surrounding circumstances and admitted facts as developed by the evidence.

First, with respect to the proposal submitted by Rozelle to Cannon in the course of the telephone conversations of November 28th and 29th, it should be kept in mind that Rozelle had talked with Coach Dietzel on several occasions prior to his initial conversation with Cannon. On one such occasion Rozelle agrees that he told Dietzel, in substance, that, "We will give Billy Cannon a three-year contract starting in 1960 for fifteen thousand a year, and a $5,000 bonus for signing the contract, but again we would like to have assurance that he would be willing to sign such a contract."

Rozelle also testified that when he talked with Cannon first on Saturday evening, November 28th, he repeated the identical terms to Cannon. (Tr. 81–82). While Rozelle also testified that his subsequent proposal was "a $10,000 bonus for signing, rather than five and for 1960 a $10,000 contract, rather than a $15,000 contract. And a $15,000 for '61 and a $15,000 for '62" it is clear that he was talking at all times about a three-year proposal. Furthermore, following the first telephone conversation with Rozelle, Dietzel called Cannon and told him that the offer Rozelle had made to him was the best he (Dietzel) had heard of a rookie getting. Whether or not Rozelle referred to his proposal as a "package"

or not it is my conclusion that Rozelle conveyed and Cannon obtained the impression that the proposal to be submitted by the Rams in the event they won the toss of the coin was to cover a three-year period with total compensation, including a bonus, of $50,000. On the other hand, it likewise seems clear that Rozelle had in mind at the time he presented the Standard Players Contract forms to Cannon for signing, judging from the fact that he submitted the bonus, injury and armed services riders as to one and left but one form, namely, Exhibit A, with Acting Commissioner Gunsel and never submitted Exhibits B and C, that the transaction would result in three separate and distinct contracts —one for each season—to be submitted to the Commissioner for approval if the Rams so desired, as each succeeding year approached. It thus appears that there was never a meeting of the minds as between the parties with respect to the offer. Construing the Contract forms as I do, i. e. requiring not only the signing by the parties but also the approval of the Commissioner, the forms as signed by Cannon—even though signed by the Rams—must be construed as an offer by him to play for the Rams for a period of three years. This offer was never accepted by the Rams inasmuch as they requested and received the approval of the Commissioner as to the first year, 1960, only.

It is true, however, that even though the signing of the Contract forms by Cannon, because of lack of approval by the Commissioner, constituted no more than an offer, Cannon did at least take possession of the $10,000 bonus check, which, under the understanding of both parties, was payable in advance of the 1960 football season and conditioned upon the player reporting to the Rams for the 1960 training camp period. Can this be construed as an acceptance of an assumed counter-offer of the Rams for the 1960 season subject to a later approval of the Commissioner as to the proposed contract, Exhibit A? This would depend, in part at least, upon the

understanding between the parties as to whether Cannon accepted the check as payment. It is undisputed that he did not endorse the check, that he left it with his banker for safekeeping, and that he returned it before the player's copy of the proposed contract, Exhibit A, approved by the Commissioner was sent to him.

Bearing on this issue Rozelle testified:

"I told Billy Cannon this would be kept in confidence, the signing would not be announced until after the Sugar Bowl and told him to take good care of the money." (Tr. 571).

Of course, the great difficulty in resolving the factual issues involved in this case results from the fact that the signing of the alleged contracts—Exhibits A, B and C—was shrouded in secrecy due to the manner in which Rozelle handled the transaction. He knew from Cannon's coach, Dietzel, that he, Dietzel, was opposed to the signing of any contract. Rozelle nevertheless intended to get Cannon's signature to a contract when, as he testified, he carefully phrased his answer to Dietzel that "The Rams will do nothing to impair Cannon's eligibility for the Sugar Bowl." (Tr. p. 62). Cannon, on the other hand, unwittingly, I am convinced, expressed his desire to apportion his anticipated 1960 income so as to make some of it taxable for the year 1959. This, of course, might well be construed as a compelling motive for accepting the check as payment. At this juncture, however, it should be noted, that Cannon, granting his outstanding ability and prowess on the gridiron, is anything but an astute business man. His whole life and interest has been directed toward athletics and particularly football; and while he impressed me as being somewhat naive for a college senior I feel certain that he knew he couldn't accept as payment the $10,000 check that was tendered him and remain eligible to play for his school in the Sugar Bowl, nor do I believe he would intentionally disqualify himself. He didn't need to. With respect to Cannon this wasn't a

chance in a lifetime to turn professional which he might lose forever if he didn't grab it immediately. By this time he must have appreciated the fact that his services were in great demand by professional football. I, therefore, am led to make the finding that Cannon did not accept the check in payment. Rather, he accepted it, believing it was not his and that he had no claim upon it until after the Sugar Bowl game.

While some, particularly those schooled—to use the vernacular—in the "game for dough" may view my interpretation of the transaction as a "Pollyanna" approach and entirely unrealistic it should be borne in mind that Cannon, while having been a highly publicized college ball player, was, in fact, and still is, it would appear, a provincial lad of 21 or 22, untutored and unwise, I am convinced, in the way of the business world. While he had entertained ambitions for years to get into professional football the proposition submitted to him by the Rams came by telephone apparently without prior notice while he was away from home and in New York for the purpose of receiving one of many rapidly accumulating honors that were being bestowed upon him. He was without counsel or advice and the whole transaction, including the signing of the alleged contracts, was completed in less than 48 hours. When Cannon arrived at the Warwick Hotel on Monday morning he did not know whether the Rams had acquired the right to draft him. He was immediately brought before the press and, as Rozelle testified, he Rozelle, heard Cannon make the statement to the effect that he would sign a contract with the Rams following the L.S.U. and Mississippi game in the Sugar Bowl on New Year's Day. (Tr. p. 96).

At that time it is reasonable to assume that Cannon had no idea that Rozelle would expect him to sign a written contract. Thereafter, Rozelle took Cannon and no one else with him to Rozelle's room where Rozelle had waiting for signature the partially-completed forms which he presented to Cannon for signature. Just what language Rozelle used in persuading Cannon to sign the documents I do not know and I doubt if either Cannon or Rozelle have a completely accurate recollection of what was said. I am persuaded, however, that during the 30 to 45 minutes spent in the room Rozelle conveyed the impression to Cannon that the documents would not become effective or binding upon him until after the Sugar Bowl game on New Year's Day. The admitted fact that Rozelle sought to keep their existence confidential and secret as well as the fact that Rozelle did not become concerned as to the Acting Commissioner's approval of Exhibit A until after he had learned on December 22, 1959 of the possibility that Cannon might go with the Houston Oilers lends support to the belief that Rozelle had so assured Cannon.

In view of the foregoing it is my conclusion that the accepting of possession of the check for $10,000 by Cannon was not an acceptance of payment under the alleged contract, Exhibit A.

Addressing myself, now, to the contention made by the plaintiff that the $10,000 bonus check is in the nature of consideration for a binding option; that is, consideration for holding open the offer of Billy Cannon for a reasonable length of time.

As I have indicated, Cannon took possession of the $10,000 check thinking that it would be his only if the contract he contemplated for three years' services became effective following the Sugar Bowl game and he further understood, as he testified, that even then he had to report to the club for the 1960 training camp period or he would have to return the bonus.

There can be no question but that the $10,000 check represented what is generally referred to in professional athletics as a bonus payment, customarily offered as an inducement to outstanding rookies. But under the facts as I have found them it was received conditionally.

Furthermore, if, as contended by plaintiff, the bonus constitutes consideration for holding the offer open for a

reasonable time and assuming further that the offer were held open in consideration thereof but the player failed for some reason other than military service to show up for the training camp period, it is my understanding of the plain language of the bonus rider attached to Exhibit A that he would be required to return it. If that be so, the bonus so far as consideration for an option is illusory. I conclude, therefore, that in this case there was no binding or irrevocable agreement on the part of Cannon to hold his offer open.

Reaching as I have the conclusion that there did not come into existence a valid written contract or contracts binding upon plaintiff and defendant there is no basis upon which to consider plaintiff's claims for equitable relief or defendant's affirmative defenses in opposition thereto. Specifically, therefore, I make no findings as to the issues of fraud and deceit, or any other of the equitable issues raised by defendant's affirmative defenses.

It probably should be observed, however, that while I have already indicated that Cannon did not intentionally or knowingly make himself ineligible to play in the Sugar Bowl game because of his dealings with the Rams on November 30th, I did not reach the issue of what in fact would have made him ineligible to play under the rules of the N.C.A.A. I do not reach it because the matter is relevant to this litigation, if at all, only as related to defendant's affirmative defense of fraud and deceit and as I have just indicated if no valid contract came into existence that issue becomes academic as far as this litigation is concerned.

Before concluding, I wish to make a correction as to the record in this case. On Friday morning I advised counsel that I would sustain an objection to the introduction of the Dave Brady deposition and grant a motion to strike the testimony of Mr. Cannon elicited on Thursday in connection with cross examination on the newspaper articles identified in the Brady deposition. I have

since concluded that this testimony should remain in the record and that the deposition should also be included. As counsel know, I read the Brady deposition before ruling upon it. I considered both in reaching my decision.

Judgment will be for defendant, with costs. Findings of fact and conclusions of law in accordance with this memorandum opinion and the pertinent admitted facts of the pretrial order entered herein may be filed with the clerk within ten days from this date and forwarded to me for signature along with the form of judgment.