943 A.2d 881 (2008)
399 N.J. Super. 158
SPRING CREEK HOLDING COMPANY, INC., Plaintiff-Appellant
v.
SHINNIHON U.S.A. CO., LTD., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 2007.
Decided March 27, 2008.
*882 Ben H. Harris, III (Miller, Hamilton, Snider & Odom, L.L.C.) of the Alabama bar, admitted pro hac vice, Mobile, AL, argued the cause for appellant (Edward A. Stein, attorney, Hackensack; Mr. Stein and Mr. Harris, on the brief).
Steven M. Richman, Princeton, argued the cause for respondent (Duane Morris, LLP, attorneys; Mr. Richman, of counsel and on the brief; Jonathan L. Swichar, on the brief, Philadelphia, PA).
Before Judges CUFF, LISA and LIHOTZ.
The opinion of the court was delivered by
LISA, J.A.D.
This appeal implicates the right of a seller of real estate to declare the buyer in material breach and terminate the agreement of sale based upon the seller's assertion that it reasonably believed the buyer would not perform, it demanded adequate assurance of performance from the buyer, and the buyer failed to provide such assurance. The seller, Shinnihon U.S.A. Co., Ltd. (Shinnihon) took this action with respect to its agreement with the buyer, Spring Creek Holding Company, Inc. (Spring Creek). Spring Creek filed this suit, seeking damages from Shinnihon for breach of contract. It also sought specific performance. After extensive discovery and the submission by the parties of a documentary record which they both deemed complete, the parties filed cross-motions for summary judgment. The Chancery Division granted Shinnihon's motion and dismissed Spring Creek's complaint. The court denied Spring Creek's motion, which sought an order of specific performance.
Spring Creek appeals. It argues that its summary judgment motion should have been granted and Shinnihon's should have been denied. Alternatively, Spring Creek argues that material issues of fact are in dispute, necessitating a trial. Finally, Spring Creek argues that the case should be remanded for further consideration in light of the jury verdict in a federal lawsuit between its feuding shareholders resolving which faction was entitled to control Spring Creek's affairs. The rift between the shareholders was at the heart of its inability to fulfill its obligations under the agreement. Shinnihon terminated the *883 agreement in June 2003. The federal action between the shareholders was pending when the trial court decided this case in October 2005. The federal jury verdict was returned in October 2006.
We conclude that the trial court correctly determined that no rational factfinder could find that Shinnihon did not reasonably believe that Spring Creek would not perform, that it did not request reasonable assurance of performance, and that Spring Creek did not fail to provide such assurance. We further conclude that the apparent resolution of the dispute among Spring Creek's shareholders more than three years after termination of the agreement has no bearing on the outcome of this litigation. We therefore affirm.

I
The nonperformance was not a failure to pay money. Indeed, Spring Creek tendered payment of the full contract price. The agreement did not contemplate merely a sale of land in exchange for money by a seller disinterested in the buyer's use of or activities with respect to the land after completion of the sale. The seller here owned and would continue to own a large improved adjoining tract of land, in which it had a substantial investment. Thus, the agreement contemplated particular zoning approvals for the parcel being conveyed to Spring Creek and the negotiation of further agreements regarding the development and use of the conveyed parcel and that retained by Shinnihon. It was Spring Creek's inability to perform with respect to those issues that led Shinnihon to seek assurance, and, when not furnished, to terminate the agreement.
The dispute developed over an extended period of time and was not caused by a single event or circumstance. To adequately explain the dispute and place it in proper perspective, we deem it necessary to set forth a detailed recitation of the events leading up to the agreement of sale between Shinnihon and Spring Creek, and the events occurring during the pendency of the agreement up to the time of termination.
The property is part of a 600-acre tract in Vernon Township. In the 1980s, Princeton-New York Investors (PNY) owned and operated the entire property as the Great Gorge Playboy Club and Resort. Included is a twenty-seven-hole golf course covering approximately 275 acres, now known as the Great Gorge Golf Course. A hotel, now known as the Legends Resort and Country Club, covers forty-three acres. An undeveloped 280-acre parcel, referred to in various agreements as the "Remainder Property," is the subject of this litigation.
In November 1990, PNY agreed to sell the golf course to Shinnihon. To overcome land use restrictions against the separation of the golf course prior to sale, the parties agreed to transfer legal ownership of the golf course and Remainder Property to Shinnihon, with PNY retaining equitable title to the non-golf course property. This Remainder Agreement provided that Shinnihon would purchase the entire parcel for $20 million. Shinnihon agreed to return the Remainder Property to PNY for nominal consideration after an amendment to the master deed effected the division of the parcel. PNY was obligated to pay taxes and other charges associated with the Remainder Property and to pursue its subdivision.
PNY failed to make some of the tax payments. In 1994, PNY filed for bankruptcy. In 1998, through the bankruptcy proceedings, Seasons Investment Corporation (SIC) purchased for $9.1 million the hotel and PNY's right to reacquire from Shinnihon the Remainder Property. SIC *884 immediately conveyed the hotel to Metairie Corporation (Metairie), by way of a $9 million mortgage note issued by Noramco NJ, Inc. (Noramco). The president of Metairie was Marvin Keith. Shinnihon sued SIC seeking a declaratory judgment absolving it of its obligations under the Remainder Agreement, arguing that PNY breached the agreement by failing to pay the real estate taxes.
Keith saw tremendous potential in this project. He wished to renovate and convert the hotel into an upscale timeshare facility, which would then serve as the centerpiece of a large timeshare community adjacent to the golf course. Keith envisioned developing the Remainder Property with "very high end" timeshare units as the perfect complement to the resort.
In June 1999, during the pendency of Shinnihon's suit against SIC, Keith formed Spring Creek, and was its sole shareholder. John Lamb, an attorney representing Keith, was the registered agent of Spring Creek. Upon its incorporation, Spring Creek entered into an agreement with SIC by which SIC assigned to Spring Creek its rights under the Remainder Agreement. SIC retained a twenty percent net profit participation interest in the Remainder Property. In July 1999, SIC assigned its participation interest to Noramco.[1] Spring Creek was substituted in place of SIC in the litigation with Shinnihon, and, after an adverse final decision, filed an appeal.
Experiencing financial difficulties with the management of the hotel, Keith sought an investment source to avoid a loan default. Seymour Svirsky and Hillel Meyers agreed to become investors and to provide financial assistance in exchange for one-third shareholder interests in both Metairie and Spring Creek. According to Meyers, creation of the shareholder interest was critical to this January 2000 deal, because the development potential of the Remainder Property provided the sole justification for a risky investment in the hotel.
During the pendency of the appeal, Shinnihon and Spring Creek entered into settlement discussions. Shinnihon claimed entitlement to reimbursement for various sums it advanced that should have been paid by PNY or its successors. Lamb represented Spring Creek, and Steven Richman represented Shinnihon in these discussions, which resulted in the execution of a Settlement Agreement on August 24, 2000.
The Settlement Agreement required Spring Creek to dismiss the appeal and pay Shinnihon a nonrefundable sum of $100,000. The parties agreed to protect the 1989 preliminary site plan approvals from the Vernon Township Zoning Board of Adjustment (zoning board) to develop 678 residential units on the Remainder Property and to cooperate in further processing the application. Spring Creek agreed to submit final site plans to Shinnihon prior to their official submission and promised that the development of the units would not adversely affect the operation of the golf course.
The Settlement Agreement contemplated Shinnihon's construction of an additional nine-hole golf course on approximately fifty-seven acres of the Remainder Property. The Settlement Agreement defined the Remainder Property, less the fifty-seven acres, as the "Residential Development Parcel." Upon attainment of final zoning approvals, Shinnihon would convey the Residential Development Parcel to Spring Creek for an additional $2 million.
The Settlement Agreement was carefully structured to assure that Spring Creek's residential development on the Remainder *885 Property would not interfere with Shinnihon's operation of the golf course, including the additional nine holes that Shinnihon might later develop. It contained, for example, these provisions:
6. Approval: Relocation of Units

(a). . . . The Approvals shall consist of 678 units (including patio homes, condos, townhouses and villas) on the Remainder Property reconfigured so that if Shinnihon desires, the Additional Nine Hole Golf Course can be constructed and so that there shall be no more than 365 "unit footprints" on that portion of the Remainder Property located around the 27 Hole Golf Course, with units on that Residential Development Parcel (excluding the Non-Contiguous Part) being able to be stacked, unless Shinnihon consents in writing to additional footprints. The balance of the 678 units remaining may be located on that portion of the Remainder Property located across Route 517 by the main entrance of the Legends Resort (the "Non-Contiguous Part").
(b) The "unit footprints" shall be divided into three sections (Sections I, II and III) and the section on the Non-Contiguous Parcel (as defined herein) shall be Section IV, as reflected in the fifth revision to the site plan. Spring Creek or its assignee shall cooperate with respect to Shinnihon's maintenance, use and operation of the Golf Course, and Shinnihon shall cooperate with respect to future development of the Residential Development Parcel so long as such development does not materially and adversely affect the use, operation or playability of the Golf Course.
. . . .
7. No Material Adverse Effect on Golf Course

(a) The 678 units (or such lesser amount as approved and accepted) to be constructed shall not materially or adversely affect the use of the Golf Course by Shinnihon, in Shinnihon's sole opinion, and the parties shall exercise their best efforts to reasonably agree upon the location of the units to minimize any interference with Shinnihon's Golf Course, including without limitation impact on sewage, drainage and irrigation, as well as construction. The parties agree that Shinnihon has no objection to the number of units developed on the Non-Contiguous Part of the Remainder Property, since any proposed units are not contiguous to the Golf Course, but Shinnihon reserves the right to require Spring Creek to take appropriate corrective measures, at Spring Creek's sole cost and expense, in the event a material and adverse effect on the Golf Course occurs. Notwithstanding the foregoing, Shinnihon agrees that the 365 footprint units have no material adverse effect in terms of their location in accordance [with] the fifth amended site plan prepared by Shinnihon. In addition, in connection with the construction of any roads that cause relocation or replacement of any Golf Course features such as greens, fairways, bunkers, cart paths, hazards and the like, then the cost of such replacement or relocation shall be the sole responsibility of Spring Creek.
(b) Spring Creek agrees to utilize best efforts to deliver any final site plans relating to the future development of the Residential Development Parcel to Shinnihon for review at least 30 days prior to the intended submission of such plan to the Vernon Township Zoning Board or such other agency as may be appropriate or relevant.
The Settlement Agreement provided that Shinnihon would be required to convey the Residential Development Parcel to Spring Creek upon "obtaining any and all *886 of the Approvals referenced in Paragraph 6 which have become final and non-appealable, or agreement by Spring Creek to accept a lesser amount of approved units." The Settlement Agreement also contained the following "Remedies" clause:
13. Remedies

In the event that the Approvals referenced in Paragraph 6 are not obtained and Spring Creek does not otherwise accept Approvals for a lesser number of units or units not containing the mix of types specified in Paragraph 6 ["including patio homes, condos, townhouses and villas"], then Shinnihon shall have no obligation to convey the Residential Development Parcel referenced in Paragraph 9, and shall retain title to the Remainder Property in its entirety.
Meyers, Svirsky and Keith each signed the Settlement Agreement on behalf of Spring Creek. Spring Creek dismissed the appeal and paid $100,000 to Shinnihon on August 28, 2000. At that point, the contours of Lamb's representation began to blur. A rift over the right to control Spring Creek was developing between Keith on the one hand and Svirsky and Meyers on the other. By letter dated August 29, 2000, Lamb informed Richman that his firm "no longer represents Spring Creek, and my clients, Messrs. Svirsky and Meyers, will decide how to acquire the property."
Contrary to Lamb's statement that he would not represent Spring Creek, he continued to act on its behalf in correspondence with Shinnihon, Vernon Township, and other attorneys, engineers and entities. Lamb's uncertain scope of representation was a symptom of a larger growing problem. According to Meyers, Keith began in late 2000 to experience "seller's remorse" and did not wish to be bound by the terms of the earlier shareholder agreements. Keith began to represent to third parties that Svirsky and Meyers lacked authority to bind Spring Creek. According to Keith, Svirsky and Meyers breached their agreements with him, thus divesting Svirsky and Meyers of their right to control Spring Creek. The validity of either faction's contentions was immaterial. The significant circumstance was that the dispute over control existed and affected the ability of the parties to proceed with development approvals. The disagreement also interfered with the ability of the parties to proceed with other agreements mutually affecting them. The Settlement Agreement contemplated that the parties would negotiate "any other agreement they deem necessary to resolve other miscellaneous issues between them, including but not limited to those affecting sewage and effluent, borders and boundaries, and other environmental issues." The record reflects that negotiations regarding some of these issues were in progress. Of course, if it could not be determined which faction spoke for and had authority to bind Spring Creek, any such discussions and ultimate agreements could be for naught.
On July 20, 2001, Keith wrote to Shinnihon's president questioning Lamb's ability to bind Spring Creek:
I only recently was apprised that Shinnihon wished to set a time of the essence closing for the above transaction. I now understand Shinnihon's counsel sent the notice . . . to John Lamb, Esq. I have great difficulty in determining who John Lamb represents at any given time, but he does not represent me or my company, Spring Creek Holding Company, Inc.
Richman wrote to Lamb on August 7, 2001 to express concern over Keith's assertions:
While it does not appear that there is a challenge to Spring Creek's authority to have entered into the settlement agreement *887 at the time, we are concerned that we are receiving communications from someone else purporting to speak on behalf of Spring Creek while we are continuing to pursue discussions with you on behalf of Spring Creek.
Please clarify who speaks for Spring Creek.
Lamb replied on August 15, 2001, expressing somewhat inconsistent positions:
I have been authorized by Messrs. Meyers and Svirsky, who own a majority of the shares of stock in [Spring Creek], are President and Secretary of Spring Creek, respectively, and constitute the sole members of the Board of Directors, to take certain actions on behalf of Spring Creek. Mr. Keith is a minority shareholder.
Because of the involvement of this matter with Mr. Keith, I will not be representing Spring Creek in any issues involving Spring Creek. . . . I have and continue to advise the shareholders that I will not get involved in an internal dispute between them and I will provide them with the facts and documents that I have in my possession. I will continue to provide the services I have been authorized to provide unless the President of the Company, Mr. Meyers, the Board of Directors, or the Corporation request I not do so.
Notwithstanding the shareholder dispute, Spring Creek and Shinnihon continued their efforts to procure final zoning approvals. Svirsky certified that the timely prosecution of the zoning application was "critical to performance under the Shinnihon Agreement." Spring Creek, through Svirsky and Meyers, filed a development application in August 2001, and the zoning board scheduled a hearing for October 3, 2001.
Keith's attorney, Stephen W. Gruhin, disrupted the process with a letter to the zoning board disputing that Svirsky and Meyers had authority to prosecute the application on Spring Creek's behalf. He alleged that fraudulent and bad faith acts by Svirsky and Meyers voided the original agreement to grant them one-third interests in the Remainder Property. This November 28, 2001 letter demanded that the zoning board withhold action with respect to the pending application. It stated:
Please be advised that this firm represents Marvin Keith, both individually and in his capacity as the sole shareholder, director and officer of Spring Creek Holding Company, Inc. . . .
Subsequent to Keith's execution of the [Settlement] Agreement in the presence of Shinnihon's authorized representative, Kiyoshi Fujinami, it appears that Messrs. Seymour Svirsky and Hillel Meyers, purportedly acting on behalf of a limited liability company known as Spring Creek Holding Company LLC, replaced the signature page executed on August 24, 2000 by Keith (on Spring Creek Inc.'s behalf) and Fujinami (on Shinnihon's behalf), with another signature page executed by Svirsky and Meyers in their therein stated capacities as two (2) of the three (3) members of Spring Creek LLC, while a blank signature line indicating Keith's involvement as the third member of Spring Creek LLC is also included on the replacement page.
Thus, Keith asserts that following the Agreement's bona fide execution as aforesaid by him and Fujinami, its signature page was tampered with. . . .
In order for the Zoning Board of Adjustment to understand the complexity of the existing disputes between Keith, Svirsky and Meyers, it bears mention that these parties (including Metair[i]e) are currently involved in several ongoing *888 disputes, both related and unrelated to the Remainder Property. . . .
At this juncture, however, Keith asserts that any transactions in which he originally became involved in with Svirsky and Meyers through Metair[i]e are either void or voidable. . . .
While it is anticipated that all of these issues will ultimately be resolved on a "global" basis in litigation yet to be commenced between the parties, the fact remains that Spring Creek LLC has no rights (contractual, equitable or otherwise) in and to the [Settlement] Agreement generally and the Remainder Property specifically.
To respond to some of Gruhin's assertions, and to request adequate assurance of performance, Richman wrote to Lamb on December 3, 2001. He stated:
I have reviewed my file as well as my copy of the Settlement Agreement. I confirm that my copy shows signatures of S[v]irsky, Keith and Meyers on the same page, although for an entity called Spring Creek Holding Co., LLC. However, the opening paragraph of the Settlement Agreement is in the name of Spring Creek Holding Company, Inc. . . . It is apparent that this typographical error escaped everyone's noticeyours, mine and the signatories.
. . . As I have mentioned in the past when Mr. Keith sent us his first letter in which he purported to speak on behalf of Spring Creek Holding Company, Inc., and particularly in view of the various statements made to Shinnihon by you as to the numerous and different corporate entities involved on your end, Shinnihon requests assurance that it is dealing with the people who have the authority to bind Spring Creek and any other entity that needs to be involved in these agreements. We don't want to finally execute the agreements we have been discussing, only to find that Mr. Keith is bringing an action that not only challenges them, but names Shinnihon as a defendant. At this point we will also require indemnification in favor of Shinnihon by Spring Creek Holding Company, Inc. and your individual clients for all time spent in responding to Mr. Keith, or in defending any action he may bring.

[Emphasis added.]
Richman also requested certain corporate documentation from both Gruhin and Lamb to prove Keith's authority, or lack of it, to bind Spring Creek. It appears from the record that Lamb provided oral assurance to Richman, but neither Lamb nor Gruhin immediately provided the requested documents. Gruhin informed Richman on January 4, 2002 that the internal dispute between Svirsky, Meyers and Keith could implicate Shinnihon in litigation.
Richman wrote to Lamb on January 14, 2002 to reiterate Shinnihon's request for assurance of Spring Creek's ability to comply with the Settlement Agreement. Richman concluded:
Shinnihon's position at this point is simply stated: Shinnihon entered into the Settlement Agreement in good faith and has done what has been required of it under that agreement. Shinnihon has also sought to negotiate with Spring Creek the related agreements necessary under the Settlement Agreement for Shinnihon to protect and maintain the integrity of the golf course. We have been negotiating those agreements with you and Messrs. S[v]irsky, Meyers and [Al Warrington]. We have now received yet another urgent communication from Mr. Gruhin stating in essence we should be dealing with Marvin Keith.
Shinnihon cannot be in a position where it is seeking to finalize agreements with Spring Creek that may be *889 subject to attack by one of Spring Creek's principals on the grounds that such agreements are "ultra vires" or without authority, or conversely, have your clients attack anything done with Marvin Keith. As we approach the new golfing season, and the application remains before the Zoning Board, it is imperative that Shinnihon have assurance (beginning with the corporate documents I have requested) that you and your clients have authority to speak for Spring Creek. The situation must be clarified and resolved.
Gruhin wrote to Lamb and Richman on January 16, 2002 to assert Keith's authority and to provide the alleged proofs. He attached Spring Creek's 1999 certificate of incorporation, an issuance of common stock to Keith, and an Internal Revenue Service letter assigning Spring Creek an employer identification number, mailed to Keith's home address. Gruhin wrote:
Based on Keith's production, in response to your requests, of the foregoing corporate "proofs" confirming his complete ownership of and total control over [Spring Creek], we anticipate that your client, [Shinnihon] will now recognize him (as opposed to Messrs. Seymour Svirsky and Hillel Meyers and their counsel, John Lamb, Esq.) as the true and only party in interest having the right to both speak for and on behalf of, and make all corporate decisions pertaining to and/or involving [Spring Creek].
. . . .
In the unfortunate eventuality, however, that Shinnihon is unwilling to cooperate . . . this letter serves to place it on ACTUAL NOTICE that Keith, acting both individually and on behalf of [Spring Creek], shall be left with no alternative, but to name Shinnihon as a co-defendant in litigation imminently to be commenced against Messrs. Svirsky, Meyers and others to protect the remainder lands and related interests. . . .
Dennis A. Estis, the attorney acting on behalf of Svirsky and Meyers with respect to the dispute with Keith, responded to Richman on January 17, 2002. He alleged that "Mr. Gruhin's letters are based upon half-truths, innuendo and, what appears to be, fraud on the part of his client and others." He also attached eight sets of documents to assure Shinnihon of Meyers and Svirsky's authority to act for Spring Creek. This letter stated:
As you can readily see from the enclosed documents, Keith acknowledged under oath on two occasions in January 2000 and reaffirmed on August 30, 2000 the fact that Hillel Meyers and Seymour Svirsky are the majority shareholders, members of the Board of Directors, and the President and Secretary/Treasurer, respectively, of Spring Creek.
. . . .
In your letter of December 3, 2001, you requested that Spring Creek provide Shinnihon with "assurances that it is dealing with the people who ha[ve] the authority to bind Spring Creek and any other entity that needs to be involved in these agreements." Messrs. Meyers and Svirsky, as evidenced by the enclosed documents, constitute the majority shareholders, the sole officers, and the sole members of the Board of Directors of Spring Creek, and, therefore, have sole authority to bind Spring Creek.
On January 29, 2002, Svirsky, Meyers and Spring Creek filed suit against Keith in federal court, seeking to enjoin Keith from taking unauthorized actions on behalf of Spring Creek. The complaint alleged Keith's attempt to disrupt Spring Creek's prosecution of the zoning application and to interfere with the Settlement Agreement. *890 In his March 1, 2002 answer and counterclaim, Keith alleged that Svirsky and Meyers lacked authority to bind Spring Creek and that their one-third shareholder interests were conditioned upon their satisfaction of a number of financial obligations, which they did not satisfy.
The two factions disagreed over the character of the residential development for the project. Keith insisted upon timeshare units, which he felt would be more profitable. Svirsky and Meyers were of the view that timeshares in the hotel were not selling as expected and it would not be advisable to construct additional ones. They sought to enter into a deal with Pulte Homes, Inc. (Pulte), a large and reputable home builder, to construct condominium units. Svirsky and Meyers agreed to authorize Pulte to act on Spring Creek's behalf to present modified plans to the zoning board. The modified plans entailed a reduction in the total number of units.
Spring Creek and Pulte executed an agreement to this effect on February 22, 2002. It contemplated the creation of "multi-family garden apartments, townhouses, patio houses and/or attached single family residential buildings . . . and associated recreational facilities." The agreement obligated Pulte to purchase the Remainder Property "upon [Pulte's] obtaining all permits and approvals necessary or required in order for [Pulte] to lawfully construct not less than four hundred eighty (480) Units . . . and to sell same to third party home purchasers."
In light of the federal lawsuit, Richman wrote to Lamb on April 4, 2002 seeking assurance of Spring Creek's ability to prosecute the zoning application. Estis responded on April 15, 2002, assuring Richman that "there is absolutely no basis in fact or in law for Mr. Keith's claim that he is the sole shareholder." He said that the federal litigation would end "the wild and untrue allegations that [Keith] is the sole shareholder of Spring Creek." Richman immediately responded that, with a "full reservation of all rights, and without prejudice to claims and defenses," the issue would remain "open" until a judge ruled on the "internecine battles" described in the pleadings.
After learning of the agreement between Spring Creek and Pulte, Shinnihon was further concerned as to which entity had authority to and was prosecuting the zoning application, which, under the Settlement Agreement, was to be prosecuted jointly by Shinnihon and Spring Creek. Lamb, purportedly speaking for Spring Creek, assured Richman that there was no assignment of the Settlement Agreement from Spring Creek to Pulte, but that Pulte was given "complete authority to negotiate on Spring Creek's behalf the issues related to the proposed project and your client's golf course." On December 13, 2002, Richman noted continuing doubts in his letter to Pulte's counsel:
[W]e have sought to obtain a response from Spring Creek as to the status of its relationship with you. While I appreciate your comments, the fact remains that Spring Creek is the party to the Settlement Agreement. We have spent over two years trying to narrow the issues and negotiate them.
Shinnihon was willing to meet and discuss its issues with Pulte as part of Shinnihon's continuing cooperation with Spring Creek under the Settlement Agreement. It did so after being advised by John Lamb that the Settlement Agreement had not been assigned, and that Spring Creek was still the responsible party. Your letter states that the certainty has been resolved to the extent that Pulte is now the responsible party. Does this mean that Pulte can bind both *891 Spring Creek and Metairie to all negotiated terms, and guarantee performance of them? Will Pulte be guaranteeing performance by Spring Creek in terms of its application for a modified permit . . .? We have been told repeatedly by Spring Creek that there has been no assignment of the Settlement Agreement, and have never been shown the Spring Creek/Pulte contract. Your letter on its face portrays Pulte as an agent. What we do not want is to spend another round of time negotiating with Pulte, only to find that Spring Creek will reject the items. On the other hand, if we are now being told that Pulte has ultimate authority to negotiate because it is in essence the owner, then we need to evaluate our position vis-à-vis the anti-assignment provision.
Lamb promptly replied, reiterating that Spring Creek had not assigned its rights to Pulte, but that Pulte would purchase the property after approvals were obtained. Pulte confirmed this arrangement.
During this period, Shinnihon was pulled into the internal feud over the control of Spring Creek. Keith's new counsel filed a lis pendens at the end of June 2002, covering not only the Remainder Property but also Shinnihon's golf course property. Richman notified Estis that this action raised further doubts about the identity of Spring Creek's authorized agents. Richman also asserted Shinnihon's right to indemnification in the event the lis pendens adversely affected Shinnihon's title. Although the District Court ordered the lis pendens discharged, the record reveals that additional lis pendens were filed against Shinnihon's property up through the argument of this appeal.
In the federal litigation, on April 15, 2003, by leave granted, Keith filed a third-party complaint against Shinnihon, seeking to enjoin it "from transferring any interest in the Remainder Lands to any party pending resolution of this litigation and determination of the rights of the parties herein." The third-party complaint was ultimately dismissed on September 26, 2005.
The final straw came with Shinnihon's receipt of a June 23, 2003 letter from Noramco. Noramco alleged agreements with Spring Creek (through Keith) in July 1999 (before Svirsky and Meyers entered the picture) and February 2000, granting Noramco a twenty percent participation interest in the Remainder Property. Consistent with Keith's vision, Noramco hoped to develop timeshare interests on the Remainder Lands. Noramco asserted that its agreement provided that any "modification to the existing zoning shall require the express written consent of Noramco" and that Spring Creek did not have the right to assign "any rights to the Remainder Lands . . . without the express written consent of Noramco." Noramco's letter informed Shinnihon that it would seek legal relief "regarding the Remainder Lands . . . regardless of the current shareholder and officer dispute."
Shinnihon declared Spring Creek to be in material breach and terminated the Settlement Agreement by letter dated June 30, 2003. Richman informed Spring Creek that Noramco's letter, along with Keith's continuing allegations, raised doubt about Spring Creek's ability to pursue the contemplated zoning approvals. Asserting that the Noramco documents were fraudulent, counsel for Meyers and Svirsky asked Shinnihon to reconsider the termination. Shinnihon confirmed the termination on July 17, 2003.
Nevertheless, Shinnihon and Spring Creek executed a consent agreement to pursue the zoning application without prejudice to their rights in the litigation. Even though Pulte's involvement with the *892 modifications terminated, Spring Creek and Shinnihon agreed to rely on the Pulte plans in their joint prosecution of the zoning application. The zoning board denied the application on February 17, 2005.

II
Spring Creek filed this action on September 30, 2003. Five of the fourteen counts are relevant on appeal. Counts three through six alleged Shinnihon's breach of contract by its termination and other acts, for which Spring Creek sought compensatory damages. Based on Spring Creek's willingness to purchase the property, count thirteen sought specific performance.
Shinnihon moved for summary judgment. The court denied the motion and made these comments regarding Shinnihon's contention that Spring Creek's failure to provide assurance constituted a breach of the contract:
[W]hether Shinnihon sought adequate assurance of due performance from Spring Creek before termination of the contract is a question of fact yet to be determined by this Court. Further, whether the threatened litigation constituted reasonable grounds for Shinnihon to believe that Spring Creek would breach by non-performance is also [a] question of fact to be determined. Therefore, as these remain material facts in dispute between the parties a determination of these issues by motion for summary judgment is precluded.
After further discovery, Shinnihon again moved for summary judgment. It argued that the internal feud caused considerable doubt about Spring Creek's ability to seek the required zoning approvals and comply with the Settlement Agreement. Shinnihon's request for assurance was met with competing law suits, conflicting representations, and Noramco's intervening claims. Spring Creek cross-moved for summary judgment. It pointed to the unequivocal assertions by Svirsky and Meyers that Keith's claim was meritless, and the filing of the federal lawsuit against Keith, to demonstrate the adequacy of assurance. The court granted Shinnihon's motion and denied Spring Creek's cross-motion on October 26, 2005. The court concluded that Shinnihon
was justified in and as is evidenced by the numerous submissions in the record sought adequate assurances of due performance from [Spring Creek]. Moreover, it is clear that [Spring Creek] failed to provide such assurances. As of this date it has yet to be determined who properly controls [Spring Creek]. In addition, [Shinnihon] had reason to believe that [Spring Creek] would be unable to pursue the required Zoning Application. As [Shinnihon] was threatened with the prospect of being sued and risked losing considerable resources; having received no adequate assurances [Shinnihon] properly terminated the Settlement Agreement.
The final order declared that Spring Creek and Metairie possessed no rights or interest in the Remainder Property. This appeal followed.

III
Spring Creek contends that genuine issues of material fact existed and the matter should have gone to trial rather than been decided on summary judgment. This was a Chancery Division case, and there was no request for a trial by jury. Thus, the Chancery Division judge would be the ultimate trier of fact. In support of its summary judgment motion, Shinnihon submitted a lengthy and detailed statement of undisputed material facts, supported by a voluminous documentary record. See R. *893 4:46-2(a). In its opposition and cross-motion, Spring Creek did not dispute any of those facts. See R. 4:46-2(b). Based upon the undisputed documentary record and course of events, Shinnihon claimed it was justified in terminating the agreement, and Spring Creek claimed there was no such justification and that it was entitled to specific performance. Spring Creek did not request a trial and did not contend that any material facts were in dispute.
Now, for the first time, without identifying specific facts in dispute, but alluding to a need to assess credibility to determine the true intent of the parties, Spring Creek argues that a trial was necessary and the matter was not ripe for disposition by summary judgment. We reject this argument.
The filing of a cross-motion for summary judgment generally limits the ability of the losing party to argue that an issue raises questions of fact, because the act of filing the cross-motion represents to the court the ripeness of the party's right to prevail as a matter of law. Petrocco v. Dover Gen. Hosp. & Med. Ctr., 273 N.J.Super. 501, 525, 642 A.2d 1016 (App. Div.), certif. denied, 138 N.J. 264, 649 A.2d 1284 (1994); Muto v. Kemper Reins. Co., 189 N.J.Super. 417, 421, 460 A.2d 199 (App.Div.1983) (addressing question over plaintiff's residence). We recognize that there is no per se rule that the existence of cross-motions for summary judgment precludes a party from seeking, as alternative relief, a trial as to certain issues. However, in light of the record that was before the trial court and the issues presented, we find no error in summary judgment disposition. In essence, the court decided the matter on stipulated facts. Bussell v. DeWalt Prods. Corp., 259 N.J.Super. 499, 512, 614 A.2d 622 (App.Div.1992), certif. denied, 133 N.J. 431, 627 A.2d 1137 (1993).
We find further support for this conclusion in Morton International, Inc. v. General Accident Insurance Co. of America, 266 N.J.Super. 300, 629 A.2d 895 (App. Div.1991), aff'd, 134 N.J. 1, 629 A.2d 831 (1993). We observed there that the Chancery Division's disposition of cross-motions for summary judgment focused on a dispute over "the inferences and conclusions to be drawn from . . . facts in the stipulated record." Id. at 307, 629 A.2d 895. We found "no practical difference between an adjudication at a bench trial or on this stipulated record on cross-motions for summary judgment." Ibid. The critical issue in the case was the intent of plaintiff's predecessors to pollute, which "might ordinarily be an issue of fact." Id. at 324, 629 A.2d 895. However, the record evidence sufficed to establish intent as a matter of law, thus justifying summary judgment. Id. at 333, 629 A.2d 895.
Against this background, we evaluate the dispute in this case. The thrust of Spring Creek's appeal questions the use of summary judgment to decide an adequate assurance case, particularly one such as this in which the terminating party's insecurity stemmed from the internal shareholder dispute of the other party. Spring Creek argues that the trial court erroneously ruled that it failed to provide adequate assurance of performance as a matter of law. We disagree.
The origin of the "demand for adequate assurance of future performance" doctrine lies in the law of anticipatory breach. Danzig v. AEC Corp., 224 F.3d 1333, 1337 (Fed.Cir.2000), cert. denied, 532 U.S. 995, 121 S.Ct. 1656, 149 L.Ed.2d 638 (2001); Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 682 N.Y.S.2d 664, 705 N.E.2d 656, 659 (1998). The latter doctrine entitles a nonrepudiating party to claim damages for total breach when the other party, through *894 an unambiguous affirmative act or statement, repudiates its contractual duties prior to the agreed-upon time for performance. Ross Sys. v. Linden Dari-Delite, Inc., 35 N.J. 329, 340-41, 173 A.2d 258 (1961); Norcon Power Partners, supra, 682 N.Y.S.2d 664, 705 N.E.2d at 659.
The traditional law of anticipatory breach, however, did not provide clear guidance for those situations in which the other party did not act in an unambiguous manner. The nonrepudiating party could either continue to perform, and subject itself to greater damages when the other party failed to satisfy its contractual duties, or halt its performance. Magnet Res., Inc. v. Summit MRI, Inc., 318 N.J.Super. 275, 288, 723 A.2d 976 (App. Div.1998) (discussing Restatement (Second) of Contracts § 251 comment b (1981)). The nonrepudiating party's decision to follow the latter course, however, could "itself be a material breach of the contract, making [it] liable for damages" should the other party choose to perform. Ibid. The innocent obligee "would be placed in the difficult position of guessing whether the obligor will perform." Marvel Entm't Group, Inc. v. ARP Films, Inc., 684 F.Supp. 818, 820 (S.D.N.Y.1988).
Accordingly, the modern view does not "limit anticipatory repudiation to cases of express and unequivocal repudiation of a contract. Instead, anticipatory repudiation includes cases in which reasonable grounds support the obligee's belief that the obligor will breach the contract." AEC Corp., supra, 224 F.3d at 1337 (emphasis added). New Jersey courts accept this approach, derived from the Uniform Commercial Code's sale of goods provision, see N.J.S.A. 12A:2-609, and contained in the Second Restatement of Contracts. Magnet Res., supra, 318 N.J.Super. at 288, 723 A.2d 976 (citing Lo Re v. Tel-Air Commc'ns, Inc., 200 N.J.Super. 59, 70-73, 490 A.2d 344 (App.Div.1985)).
The Restatement provides:
(1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach under § 243, the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.
(2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.
[Restatement (Second) of Contracts § 251 (1981).]
Whether the obligee's asserted grounds to demand adequate assurance are "reasonable," and whether the obligor's response is "adequate," are ordinarily questions of fact for the jury. Green Constr. Co. v. First Indem. of Am. Ins. Co., 735 F.Supp. 1254, 1263 (D.N.J. 1990), aff'd o.b., 935 F.2d 1281 (3d Cir. 1991); Magnet Res., supra, 318 N.J.Super. at 286, 723 A.2d 976; Lo Re, supra, 200 N.J.Super. at 72-73, 490 A.2d 344. "Nevertheless, occasions do arise where the undisputed facts establish that insecurity or the lack of insecurity existed as a matter of law." Top of Iowa Coop. v. Sime Farms, Inc., 608 N.W.2d 454, 467 (Iowa 2000) (citing BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 702-03 (2d Cir.1993); Kaiser-Francis Oil Co. v. Producer's Gas Co., 870 F.2d 563, 568 (10th Cir.1989); Green Constr. Co., supra, 735 F.Supp. at 1262-63).
Our jurisprudence likewise does not preclude the resolution of adequate assurance cases on summary judgment. See, e.g., *895 Koch Materials Co. v. Shore Slurry Seal, Inc., 205 F.Supp.2d 324, 332-33 (D.N.J. 2002) (applying New Jersey law to conclude that "any reasonable fact-finder would determine that" party failed to give adequate assurance); Magnet Res., supra, 318 N.J.Super. at 291-92, 723 A.2d 976 (finding that "a properly instructed jury could not reasonably have found" that plaintiff lacked reasonable grounds to seek adequate assurance of performance).
Employing the same legal standard that governs trial courts, we review de novo the lower court's decision to grant summary judgment. Turner v. Wong, 363 N.J.Super. 186, 198-99, 832 A.2d 340 (App.Div. 2003); Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). We consider the proofs to determine whether "there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). To decide whether a "genuine" issue precludes the entry of summary judgment, we must assess "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). Summary judgment is appropriate when the evidence is "`so one-sided that one party must prevail as a matter of law.'" Id. at 533, 666 A.2d 146 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)).
Spring Creek's argument focuses on the adequacy of its assurance to Shinnihon. To preclude summary judgment, the evidence relied upon by Spring Creek would have to be such that a rational trier of fact could conclude that Spring Creek gave adequate assurance to Shinnihon. Kaiser-Francis Oil, supra, 870 F.2d at 568 (citing Anderson, 477 U.S. at 254, 106 S.Ct. at 2513, 91 L.Ed.2d at 215-16). Put differently, Shinnihon must show that no rational trier of fact could conclude that Spring Creek gave adequate assurance to Shinnihon.
New Jersey precedents provide little guidance on the use of summary judgment to decide an adequate assurance case like the one presented here. This case does not concern an obligor's failure to make timely payments under a long-term sales contract. Cf. Magnet Res., supra, 318 N.J.Super. at 287-89, 723 A.2d 976. Nor does this case require the sensitive factual inquiry of Lo Re, supra, 200 N.J.Super. at 71-73, 490 A.2d 344, in which we refused to find, as a matter of law, that the plaintiff repudiated a contractual requirement to provide "free and reasonable access." Rather, this appeal concerns a sale of land, dependent on the parties' general cooperative effort to procure approvals from a third-party zoning board. It is thus helpful to canvass the comments to the Restatement and decisions of other jurisdictions for guidance.
Although Spring Creek does not challenge Shinnihon's asserted grounds to demand assurance, our consideration of this prong informs our consideration of the adequacy of Spring Creek's assurance. The source of Shinnihon's insecurity was the internal feud between Spring Creek's three shareholders. During Shinnihon's continued dealings with Spring Creek's legal representatives, Lamb and Estis, Keith protested to Shinnihon and third parties, including the zoning board, that he possessed the sole authority to bind the corporation. According to Shinnihon, this feud raised serious doubts about Spring Creek's ability to prosecute the zoning application *896 and negotiate additional agreements as required by the Settlement Agreement. Shinnihon feared that Keith, if successful in federal court, would bring tortious interference claims against Shinnihon for its involvement in Spring Creek's ultra vires agreements. We must assess the adequacy of Spring Creek's responses within this context. Proper assurance needed to respond to Shinnihon's uncertainty over its ability to negotiate with the proper corporate authorities. Spring Creek's representations did not rise to this level.
At the outset, we decline to rely on the state court lawsuit Keith filed against the zoning board, and in which Shinnihon was joined as a defendant after June 30, 2003, to assess Shinnihon's grounds for insecurity before that date. These later circumstances are irrelevant to our consideration of Shinnihon's state of mind at the time of termination. See Brisbin v. Superior Valve Co., 398 F.3d 279, 289 (3d Cir.2005); Koch Materials, supra, 205 F.Supp.2d at 330. However, we do recognize the salience of both Keith's third-party complaint against Shinnihon in the federal litigation and the filing of lis pendens against Shinnihon's property prior to the June 30, 2003 termination.
Both actions exemplify the Restatement view that the obligor need not breach the contract to justify the obligee's request for adequate assurance. The relevant comment contemplates that "events that indicate a party's apparent inability, but do not amount to a repudiation because they are not voluntary acts, may also give reasonable grounds for such a belief." Restatement (Second) of Contracts § 251 comment c (1981).
The facts here squarely present such a circumstance. Whether or not we characterize Keith's detrimental representations to the extent they deviated from the corporate agenda of Meyers and Svirsky, Spring Creek's alleged majority shareholdersas the "involuntary" acts of Spring Creek, it is clear as a matter of law that the representations demonstrated Spring Creek's apparent inability to prosecute the zoning application. The straightforward reading of Gruhin's November 28, 2001 letter to the zoning board, and the filing of a third-party complaint seeking to enjoin Shinnihon "from transferring any interest in the Remainder Lands to any party pending resolution of this litigation and determination of the rights of the parties herein," provide ample support for this conclusion. Considering that Shinnihon would not transfer its interest in the Residential Development Parcel until the receipt of final zoning approvals, Keith's third-party claim implicated Spring Creek and Shinnihon's joint cooperation on that matter. There were reasonable grounds for Shinnihon's insecurity; no reasonable factfinder could find otherwise.
We next assess Spring Creek's attempted assurance. "Whether an assurance of due performance is `adequate' depends on what it is reasonable to require in a particular case taking account of the circumstances of that case." Restatement (Second) of Contracts § 251 comment e (1981). Courts can consider a number of factors, including "[t]he relationship between the parties, any prior dealings that they have had, the reputation of the party whose performance has been called into question, the nature of the grounds for insecurity, and the time within which the assurance must be furnished." Ibid.
The record here demonstrates that, for a period of about two years, Shinnihon's requests for assurance yielded contradictory claims from attorneys representing either of the two shareholder factions. Each faction challenged the authority of the other to bind Spring Creek in its interaction with Shinnihon and prosecution of *897 the zoning application. This contest for authority between Svirsky and Meyers, on the one hand, and Keith, on the other, placed Shinnihon in an uncertain position with respect to the Settlement Agreement.
The Settlement Agreement recognized Shinnihon's concerns over the development's potential adverse effect on the continued operation of the golf course. It contemplated the negotiation of further agreements between Spring Creek and Shinnihon to preserve particular easements and to resolve nascent environmental complications, and a particular type of development on the Residential Development Parcel. Given these contractual protections, Shinnihon needed to be confident of Meyers and Svirsky's authority to move forward with negotiations and to prosecute the zoning application in accordance with the Settlement Agreement. The record reflects the interdependence of the two corporate entities in this complex endeavor.
As events unfolded in 2002, however, it became clear that the feuding shareholders held diametrically opposed views on the optimal development of the Residential Development Parcel. Meyers and Svirsky, pursuant to the agreement with Pulte, sought to develop the land as resort-oriented housing and other residential units. Keith's answer in the federal litigation presented his deep disagreement with these "unauthorized" submissions to the zoning board and his desire to maximize profit through the development of timeshare units. These divergent positions, going to the core of the Settlement Agreement, placed Shinnihon in an untenable position. The pursuit of one type of development would upset the dissenting shareholder(s).
Meyers and Svirsky responded to Shinnihon's concerns with confident predictions of success in the federal litigation. Estis produced eight documents in January 2002 to demonstrate the falsity of Keith's claimed ownership of Spring Creek. However, these documents pertained to events in 2000. They did not address Keith's claim that the failure to perform certain financial obligations in the first half of 2001 divested Meyers and Svirsky of their shareholder interests in Spring Creek. Thus, there was arguable merit to each side's claim that the other lacked authority to negotiate additional agreements with Shinnihon and to bind Spring Creek before the zoning board.
This cloud of ownership cast doubt on the adequacy of Spring Creek's assurances in 2002. Spring Creek never sought to alleviate Shinnihon's uneasiness through a written offer of indemnification. Rather, the record evidence demonstrated that the "assurances" constituted predictions of success in the federal litigation or straight denials of any problem. An August 2002 letter from Lamb to Richman asserted, "Spring Creek is not in breach. Spring Creek will not breach the agreement. Spring Creek does not anticipate a breach." It did not provide other tangible assurance.
This letter also characterized Shinnihon's expression of insecurity as an anticipatory breach, referencing Spring Creek's right to reinstate the appeal, to sue for specific performance, and to sue Shinnihon for any damage to Spring Creek's relationship with Pulte. We do not construe these threats as adequate assurance of performance. In reaching this conclusion, we recognize that Spring Creek's expression of this position does not suffer from the same deficiencies as the assurances in other cases. See AEC Corp., supra, 224 F.3d at 1338-39 (relying on financial dispute with surety to explain failure to meet future deadline did not constitute adequate assurance, especially as contractor offered "no reason to believe that those difficulties *898 would be resolved any time in the near future"); AMF, Inc. v. McDonald's Corp., 536 F.2d 1167, 1171 (7th Cir.1976) (refusing to find adequate assurance in the seller's failure to repair a prototype unit and to cure the unsatisfactory conditions at a production plant); Koch Materials, supra, 205 F.Supp.2d at 332-33 (finding that party's disclaimer of any knowledge about the need to secure the other party's consent to an assignment, and the party's failure to indicate its ability to meet a volumes requirement, did not provide adequate assurance); Bitzes v. Sunset Oaks, Inc., 649 P.2d 66, 70 (Utah 1982) ("The respondent's answer through its attorney inviting a lawsuit is certainly a failure to provide any assurance of due performance.").
We do not necessarily hold that Shinnihon enjoyed the right to terminate the contract as a matter of law at that time. We only note that Spring Creek's attempts to assure Shinnihon of its authority, with the accompanying attempt to discredit Keith, did not alleviate the reasonable grounds for Shinnihon's insecurity. We read the substance of Spring Creek's representations in conjunction with the unresolved allegations in Keith's answer and counterclaim in the federal action. Doing so, it is clear that there was a reasonable doubt about the control of the corporation and the future development of the Remainder Property. It was not Shinnihon's responsibility, given the facial allegations of the federal pleadings, to determine which of the factions spoke for Spring Creek.
Even though there were reasonable grounds for insecurity, which the alleged assurances did not alleviate, the Restatement did not require Shinnihon to terminate the contract immediately. When the obligee possesses reasonable grounds to believe the obligor will be unable to perform, "the obligee may choose not to treat the failure to provide assurances as a repudiation and may continue to perform without affecting his right to recover damages for subsequent loss that he could have avoided by so treating it." Restatement (Second) of Contracts § 251 comment b (1981). This cautious approach has particular resonance in the circumstances of this case. A number of parties have expended considerable effort over the years to revitalize the Great Gorge area. Hoping to develop the land in the manner least harmful to the operation of its golf course, Shinnihon exercised special care in the drafting of the Settlement Agreement. The Settlement Agreement contemplated the pursuit of particular zoning approvals and the negotiation of additional agreements with Spring Creek. Given the prior expenditure of capital in this matter, we will not interfere with Shinnihon's business decision to continue to cooperate with Spring Creek in spite of Keith's threats and lawsuits.
As noted, however, Shinnihon notified Spring Creek of its intent to terminate the Settlement Agreement at the end of June 2003. It based the decision to terminate on Noramco's assertion of the contractual right to control the permit modification process and to assert a twenty percent participation interest in the Remainder Property.
Preliminarily, Spring Creek claims that the receipt of the Noramco letter required Shinnihon to request fresh assurance prior to its decision to terminate the Settlement Agreement. According to Spring Creek, a reasonable factfinder "could conclude that Shinnihon terminated the contract not because of the shareholder disputeover which it sought assurance but over the Noramco issue, over which it did not." We reject this argument.
It is clear that the point of contention between the two shareholder factions was the development of the Residential Development *899 Parcel. Keith began to challenge Meyers and Svirsky's authority to pursue the "unauthorized" zoning approvals shortly after their alleged commandeering of Spring Creek. This challenge manifested itself in Keith's unilateral demand that the zoning board halt its consideration of the application until the resolution of the shareholder dispute. Keith continued to meddle with the zoning process throughout the disputed period, to the point that he filed a state court action against the zoning board. The relevance of Noramco's claim lies in its tendency to corroborate Keith's position with respect to the proper development of the property.
The ownership dispute and the zoning dispute were two sides of the same coin. The character of the future development depended on the ownership of Spring Creek. With Meyers and Svirsky's control would come the development of Pulte's residential units; with Keith's control would come the development of timeshare units. Any reasonable trier of fact would conclude that the discovery of Noramco's purported interest in the development of timeshare units provided crucial evidence of Spring Creek's inability to pursue approvals in accordance with the Settlement Agreement.
Indeed, Noramco's assertions presented even greater reason than the ownership dispute to doubt Spring Creek's performance of the Settlement Agreement. Whether or not the federal litigation concluded in favor of Meyers and Svirsky, the July 1999 agreement with Noramco predated their involvement in Spring Creek. This prior agreement contemplated the development of timeshare units and the retention by Noramco of certain rights in the Residential Development Parcel. As part of their general denial of Keith's authority to deal with Shinnihon, Meyers and Svirsky disclaim this allegedly fraudulent agreement because they had never seen it.
We do not pass upon the merits of this claim, which, of course, is not before us. We note, however, that the claim appears to ignore basic principles of corporation law. The primary purpose of incorporation "is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163, 121 S.Ct. 2087, 2091, 150 L.Ed.2d 198, 204 (2001). As a distinct legal entity, the corporation "is bound by its contracts regardless of internal disagreements or internal agreements." 1 William Meade Fletcher, Cyclopedia of the Law of Corporations § 29 (rev. vol. 2006); see O.D. Silverstein, M.D., P.C. v. Servs., Inc., 165 Mich.App. 355, 418 N.W.2d 461, 463 (1987).
Thus, the later internal feud between the three shareholders does not necessarily relieve Spring Creek of the contractual obligations imposed by the agreement with Noramco, if it was a valid agreement, executed shortly after Keith's incorporation of Spring Creek in 1999. C.B. Snyder Realty Co. v. Nat'l Newark & Essex Banking Co. of Newark, 14 N.J. 146, 154, 101 A.2d 544 (1953). From Shinnihon's perspective, Spring Creek's ongoing failure to provide adequate assurance culminated with the discovery of this agreement. Given the continued vitality of Keith's federal counterclaims, the common interest of Keith and Noramco, the alleged need to receive Noramco's consent to deviate from the preferred development of timeshares, and Noramco's threat to sue Shinnihon for the unauthorized prosecution of the zoning application, we agree with the trial court that no reasonable trier of fact could conclude *900 that Spring Creek provided adequate assurance during the relevant period.
We are unpersuaded by Spring Creek's assertion that the three shareholders shared the common desire to "close" the land transaction, even in the absence of the final zoning approvals. We do not doubt each faction's desire to take over the Residential Development Parcel. However, the Settlement Agreement conditioned the transfer of this land on the receipt and acceptance of final zoning approvals. The allegations by Keith, supported by the discovery of the Noramco agreement, reflect Spring Creek's failure to provide adequate assurance of its ability to seek these approvals. We conclude that the contents of the stipulated record entitled Shinnihon to judgment as a matter of law. Spring Creek's failure to provide adequate assurance within a reasonable time constituted a material breach and justified Shinnihon's termination of the Settlement Agreement.

IV
Spring Creek argues that the Remedies clause in the Settlement Agreement was a contingency clause inserted for its sole benefit. Thus, Spring Creek claims it could waive zoning approvals and, upon payment of the additional $2 million purchase price, Shinnihon was required to transfer title. We do not agree.
The Remedies clause, by its plain language, conditioned any future conveyance on the receipt of approvals and expressly provided that if approvals were not obtained Shinnihon "shall have no obligation to convey the Residential Development Parcel . . . and shall retain title to the Remainder Property in its entirety." We acknowledge, of course, that the provision also authorized Spring Creek to accept approvals for a lesser number of units or of a different mix than those otherwise specified in the Settlement Agreement. Nevertheless, zoning approvals were required as a prerequisite to the intended conveyance. The Settlement Agreement provided for the joint prosecution of zoning approvals by Shinnihon and Spring Creek, and provided Shinnihon with the right to review and approve development applications before they were officially submitted. As we have described, the specific development approvals were of critical importance to Shinnihon as well as Spring Creek, because of Shinnihon's ownership of the adjoining golf course, its intention to expand the golf course, and the pervasive provisions in the Settlement Agreement designed to assure that development of the Residential Development Parcel would not interfere with the operation of the golf course and would meet with Shinnihon's approval.
Considering the overall agreement, we reject Spring Creek's simplistic argument that the right to accept a "lesser amount" of units means that it could accept zero units. Such a construction ignores the plain language of the Remedies clause that requires approvals, which were never obtained. And, it disregards the interrelationship between Shinnihon's and Spring Creek's interests in the manner in which the Residential Development Parcel would be developed.
"Interpretation and construction of a contract is a matter of law for the court subject to de novo review." Fastenberg v. Prudential Ins. Co. of Am., 309 N.J.Super. 415, 420, 707 A.2d 209 (App.Div.1998). Interpreting the Remedies clause in the context of the Settlement Agreement as a whole, see In re Fairfield Gen. Corp., 75 N.J. 398, 414, 383 A.2d 98 (1978), we find no ambiguity and conclude, as did the trial judge, that the provision was not a contingency clause for the sole benefit of Spring Creek.

*901 V
During the pendency of this appeal, the federal jury found that Keith breached his fiduciary duty to Metairie and Spring Creek and intentionally interfered with Spring Creek's contractual relations. Final judgment, entered on October 18, 2006, ordered that the three men each owned 33.3% of the shares of Spring Creek. The judgment also enjoined Keith's interference with the business activities of Spring Creek and Metairie, "including but not limited to the alienability of the so-called `remainder' property."
Based on this outcome, Spring Creek argues in its reply brief that there is no basis for Shinnihon to be uncertain about the future of the Settlement Agreement. Svirsky and Meyers asserted during the two years prior to Shinnihon's termination that they possessed the authority to negotiate with Shinnihon and to prosecute the zoning application. Thus, Spring Creek contends, the federal outcome confirms these assertions and precludes Shinnihon from backing out of the contract "simply because it chose to terminate it before the federal court ruled." Seizing on the Chancery Division's recognition that "[a]s of this date it has yet to be determined who properly controls" Spring Creek, Meyers and Svirsky hope to turn back the clock to resuscitate their right to acquire the property.
However, as we have noted, we consider "the facts and circumstances known at the time" to assess the reasonableness of a nonrepudiating party's grounds for insecurity. Brisbin, supra, 398 F.3d at 289. We decline to consider the adequacy of assurance given after the expiration of the reasonable time for such assurance. Koch Materials, supra, 205 F.Supp.2d at 330 (referring to the Uniform Commercial Code's requirement to provide adequate assurance within thirty days). The federal jury's verdict in favor of Svirsky and Meyers in 2006 does not change the factual circumstances as they existed from 2001 to 2003, the period when Shinnihon doubted Spring Creek's ability to comply with the Settlement Agreement and accordingly sought but did not receive adequate assurance from Spring Creek. We will not rely on the fortuitous resolution of the federal litigation more than three years after Shinnihon's termination of the Settlement Agreement to engage in post hoc review of the reasonableness of its actions.
Affirmed.
NOTES
[1] SIC and Noramco had at least some common owners.